# EXHIBIT A

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

| | |
|---|---|
| **The Petitioner** | **Yitzhak Ifergan** |
| | represented by his Attorney Atty. at Law Daniel bar |
| | **versus** |
| **The Respondents** | **1. Gerard Meir Barens** |
| | **2. B.S.A. Bracha Ltd.** |
| | Represented by their Attorneys Atty. at Law, Alon Pomeranz, Atty. at Law Shimrit Carme-Naamat and Atty. at Law Galit Bik |

## <u>Judgment</u>

1.  The Parties' dispute in the claim revolves around the question of which of them has the ownership of Respondent 2's shares (hereinafter: "the Company"), and, with the result as to who is the rights owner in the land known as Parcel 1 Block 4536 in Rehovot (hereinafter: "the land"), that is currently under the ownership of the Company.

2.  There is no dispute that the Company's shares are registered it the Companies Register in their entirety in the name of Respondent 1 (hereinafter: "the Respondent" or "Barens") after the Petitioner (hereinafter: "the Petitioner" or "Ifergan") signed the agreement for the acquisition of the Company on behalf of the Respondent on April 8, 2008. Ifergan signed the agreement by virtue of a General Power of Attorney given to him by Barens. Now, Ifergan claims that, despite the fact that the Company was acquired in the name of Barens and despite the fact that the Petitioner declared before the Shares Registrar that Barens is the sole Shareholder of the Company, surely in the truth of the matter the Company was acquired by Ifergan and is under his sole ownership.

3.  In the original Originating Summons, that Ifergan submitted, the Court was petitioned to grant declarative relief pursuant to which he is the owner of the Company and the land and to instruct the Companies Registrar to transfer the Company's shares registered in the name of Barens into the Petitioner's name. He also petitioned the Court to instruct the Lands Registrar to transfer the registration of the Company's rights in the land into his name. In the amended Originating Summons that was submitted after the reply letter had been submitted on behalf of the Respondents, in which it was claimed that Barens is the Shareholder in the Company, Ifergan petitioned to instruct [obscured words] the remedies,

[stamp] The Law Worm
[logo]
Bank
T18.me/55724-04-13

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

including giving a declaration pursuant to which Barens holds the Company's shares in trust for him; the declaration pursuant to which the Power Attorney that Barens gave to Ifergan is valid; a declaration that the encumbrance registered on the land in favor of the mortgage bank is also valid; granting an injunction prohibiting executing actions on the land by the Respondent; and an instruction to the Respondent to transfer the shares of the Company into the Petitioner's name.

**The Factual Background**

4. Some of the facts regarding the matter are not in dispute between the Parties. The two Parties together testified that a close friendship had prevailed between them over many years, both during the period when both of them resided in France and after Ifergan had immigrated to Israel in 2006 and that, over more than two decades they regarded each other as true brothers. Barens visited Ifergan on the Festivals, called Ifergan's mother "mom," and a relationship of brotherly love and friendship prevailed between the two. There is also no dispute that Ifergan's businesses in France ran into difficulties and, because of the difficulty that they faced, Barens assisted him with the most significant cash sums. There also no dispute that, on May 8, 2007, Barens signed a General Power Attorney in favor of Ifergan, that enabled Ifergan to execute many actions for Barens and in Barens' name, including acquiring assets and shares.

5. On April 8, 2008, as Barens' Power Attorney and in his name, Ifergan signed "an agreement to transfer shares" that was drawn up with Moshe Dadash (hereinafter: "the agreement"). The agreement was drawn up between Moshe Dadash and Barens and the Company called "M. Dadash Promotion of Projects Ltd." which is the former name of Respondent 2 (the Respondent's name was changed to its current name at the Companies Registrar on December 29, 2008). Pursuant to the provisions in the agreement, the seller (Dadash) undertook to transfer all his shares, obligations and rights in the Company to the buyer (Section 4 of the agreement). The agreement also established that Barens would pay Dadash a sum of NIS 330 for the shares (Section 5 of the agreement) and that Barens would settle the loans and owners loans in the sum of NIS 6,635,000 that Dadash had extended (Section 6 of the agreement). As aforementioned, Ifergan signed the agreement and, under the buyer's signature the following was written: "Gerard Meir Barens represented by his legal representative, George Ifergan."

6. The documents that Barens submitted attached to the reply to the Originating Summons indicates that, on the date of signing the agreement, Dadash signed a Share Transfer Deed, pursuant to which he transferred all his shares in the Company to Barens (Appendix 2 to the reply). This document was signed by Ifergan by virtue of a Notarially executed Power Attorney dated May 5, 2007.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

On April 9, 2008, the day after signing the agreement, "notification of a transfer of shares in a private company" was submitted to the Registrar of Companies, pursuant to which all the shares were transferred to Barens. This notification was signed on April 8, 2008 by Ifergan as Barens' legal representative (Appendix 4 to the reply). Within the frame of reference of this notification, Ifergan declared that "the details in the notification are correct and complete," after he had been cautioned by an Atty. at Law that he was to state the truth and that he would be subject to the sanctions prescribed in the law if he does not do so (ibid). In his cross-examination, he replied that all the issues stated in this document are the truth (Page 27 of the transcript, rows 5-10), and when asked how this correlates with his current version, he replied that while he had bought the plot in Barens' name, "it is my plot" (Page 27 of the transcript, rows 11-12).

The documents attached to the reply to the Originating Summons, also indicate that, on August 5, 2012, more than four years after the acquisition of the shares, the Company's annual financial statements were submitted to the Registrar of Companies (Appendix 52 the reply). As a part of the statements, the Company reported the fact that there had been an Annual Meeting on July 25, 2012 in which it was clarified that Barens is the sole Shareholder in the Company. Ifergan also signed the financial statements as Barens' legal representative and, once again, the signatory declared "that the aforementioned details are correct and complete." There is no dispute that as at the present, all the shares in the Company are registered in Barens' name at the Registrar of Companies (see Appendix 3 to the reply as well).

7.  The claim was submitted on behalf of Ifergan five years after the acquisition of rights in the Company. This substantial delay was explained by him in the claim that only "recently" was a dispute discovered between the two and, therefore, he decided to adopt measures to prevent trouble and demand that the Court recognize the fact that he is the true acquirer of the land.

8.  A study of the agreement between Dadash and Barens and all the documents submitted to the Registrar of Companies does not disclose, nor even hint that Ifergan has any right whatsoever in the Company or its shares. Even if Ifergan signed all the documents, he made sure to sign all the documents while specifying the fact that he was doing so as Barens' legal representative. As aforementioned, Ifergan declared, on at least two different occasions, over an interval of more than four years between them, that the report pursuant to which Barens is the owner of all the shares in the Company is a correct and accurate report. This affidavit was furnished after he had been cautioned that he was to state the truth. Despite this, now he claims that the ownership of the shares and the Company have been given to him exclusively and that, for concealed reasons whatever, he preferred, at the time, to register the ownership of the Company's shares in the name of Barens and to declare under oath affidavits that do not reflect the facts as they exist.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

9.  In not even one of the affidavits that Ifergan submitted as a part of the suite has it been clarified as to **why** he acquired the Company in Barens' name and not in Ifergan's name. The only thing stated in the affidavit is that Ifergan used the General Power Attorney "on a number of dates for the purposes of a number of transactions" and, inter alia, for the purposes of signing the agreement with Dadash (Section 15 of the original affidavit and Section 12 of the amended affidavit). It must be clarified that, a number of affidavits were submitted on behalf of Ifergan during the management of the proceedings: He submitted 2 affidavits on the date of submitting the claim (an affidavit supporting the Originating Summons and an affidavit supporting the petition for granting an injunction, both of which were signed on April 29, 2013); an affidavit supporting the reply to the petition to cancel the injunction (the affidavit does not bear a date, but it was submitted on September 1, 2013); an affidavit supporting the amended petition by way of an Originating Summons, which was submitted on October 6, 2013 (in the affidavit it is written that he signed it on May 13, 2013, but, indubitably, reference is to an error); and a number of affidavits in the interim petitions that relate, inter alia, to the question of who the owner of the land and the Company is (see, for example, his affidavit dated June 8, 2014 regarding an attempt to subpoena a witness, Gad Abu-Hatzira and an affidavit dated July 29, 2014 regarding the request to subpoena the witness, Mark Marciano).

10. Despite the multitude of affidavits, the Petitioner's version has remained highly diluted of items in all regarding the question as to why he acquired the land in Barnes' name. The only reference to this matter was introduced in Section 9 of the affidavit that he submitted in support of the amended petition, in which it was stated that "in view of the difficulties that I had to face in France and my fear of the unknown, and in view of the relationship of friendship and trust that prevailed between myself and Respondent 1, I requested that Respondent 1 enable me to acquire assets in Israel in the name of Respondent 1 as a trustee for me and to act pursuant to my sole discretion in all regarding them." This general statement, contains nothing to explain why he acquired the specific plot. As shall be clarified below, the claim, pursuant to which the Respondent served as a trustee for the Petitioner has not been proven in any manner whatsoever; the issue of the Petitioner's economic difficulties was raised in this affidavit for the first time and, this only in response to the fact that things were unfolded in Barens' affidavit; and, in any event – also in this affidavit no explanation was given regarding the circumstances that surrounded the acquisition of the Company that is the subject of the claim, why the ownership of this Company was registered in the name of the Respondent, what profit sprouted for the Petitioner from this manner of conduct and why a false report was furnished to the Registrar of Companies.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

11. The Petitioner does not deny the fact that he must overcome a high hurdle in order to prove that, despite the documents drawn up as they were drawn up, indeed in truth the shares in the Company were acquired by him and for him and that the ownership that was registered in the name of Barens is nothing other but in the bounds of a formal registration. However, according to him this can be deduced from Barens' admission regarding Ifergan's right. This matter will be discussed in context.

**<u>Discussion</u>**

12. Prior to discussing the facts that have an effect, even ostensibly on the results, the dispute of the Parties must be placed in the appropriate evidential context. In this regard, we reiterate that as a rule, the Shareholders' Registrar will be prima facie evidence of the correctness of what is registered therein" (Section 133(a) of the Companies Law, 5759 – 1999; hereinafter: "the Companies Law"). The Companies Law also establishes that "a Shareholder in a private company is anyone registered as such in the Shareholders' Register or anyone who holds a share deed" (Section 176 of the Companies Law). In the matter of registering certain actions at the Registrar of Companies, it has already been established that "they are declarative and not constitutive actions" (Civil Appeal 2140/01 **Nahmias vs. the Assets of the Moskowitz Family Ltd.** (Verdict 56(6) 481, 487c (2002)). However, it was established that a registration at the Registrar of Companies is in the bounds of "significantly acceptable evidence" (the Supreme Court authorized this matter in the determination of the District Court without any decision on the question as to whether this conclusion is based on the fact that it can be seen as "a public document" in the sense of Section 29 of the Evidence Ordinance or that it can be seen as "an institutional record" in the sense of Section 36(a) of the Evidence Ordinance – Civil Appeal 7443/08 **Reichter-Gacht vs Home Parcel 39 Block 6204 Ltd.** dated August 30, 2011 in paragraph 5 of the verdict). The accumulated significance of all these indeed leads to the conclusion that the Petitioner of the Court to grant decorative remedy that is in contrast to the registration at the Registrar of Companies "is obligated with an intensified burden of proof" (see the statements made by the Hon. Judge I Baron in Civil Case (Tel Aviv) 223/08 **Bedihi vs. Mayusat,** dated May 21, 2012 in Paragraph 20 of the Verdict).

All the aforementioned indicates that the Petitioner has the heaviest burden of proof, when he must convince the Court that the registration at the Registrar Companies does not reflect the reality.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

In truth the burden in the event under discussion is sevenfold heavier, because there is no dispute that the Petitioner is the person who executed the registration at the Registrar of Companies. It is he who declared time and again that this registration reflects the reality as exists, and, now he petitions this Court to establish that his affidavit in the past did not reflect the truth.

13. In support of his claims, the Petitioner submitted an affidavit on behalf of the previous owner of the Company, Moshe Dadash, in which Dadash relates to conducting the negotiations and the things stated therein by Ifergan (the affidavit is attached to the Originating Summons and to the petition to grant temporary relief). The Petitioner informed the Court that he would subpoena Dadash to give evidence (the transcript dated May 13, 2014, on page 3 of the transcript, row 15). Despite this notice, the Petitioner did not subpoena Dadash to give evidence, and gave notice at the opening of the testimony session on October 1, 2014 that Dadash would not be coming to give evidence. Therefore, it was established that Dadash's affidavit would not be used as a part of the evidence in the case. Under the circumstances of matters that were created, the testimony of Ifergan and Barens squared up against each other, without any external supporting evidence of any entity whatsoever who was involved in the business between the two and without anyone relating to the transaction clarifying who the Parties to the transaction were and why it was conducted as it was conducted.

**The Claim of Trust**

14. According to Ifergan, the plot was acquired by him and for his reasons, he used Barens' identity for acquiring the plot. As aforementioned, in the amended affidavit, Ifergan claimed, for the first time, that, in the truth of the matter, the Company and land were acquired by Barens in trust for Ifergan. During his examination, he also claimed this for the first time, that **he had informed** Barens of the fact that he was acquiring the land when Barens serves as a trustee for him (page 24 of the transcript, rows 9-12 and rows 22-23). Ifergan was unable to explain why he had not specified in the amended affidavit that he had informed Barens that he was serving as a trustee for him (page 25 of the transcript, rows 6-10). In his conclusions, the Petitioner's Attorney attempted to refine the claim, when, for the first time he claimed that reference was to "an understood" trusteeship and that the deduction from this is that the plot was acquired with Ifergan's money.

15. Ifergan's claim pursuant to which the plot was acquired in trust cannot be accepted. This restrained claim, that was first raised within the framework of the petition for amending the Originating Summons, and received additional dilution during the cross-examination and conclusions, is not in line with the original petition and affidavit that Ifergan submitted. In his conclusions, Ifergan indeed attempted to claim that he had not claimed trusteeship as a part of the original claim because, in his innocence, he was convinced that there would not be any dispute regarding the question of the ownership of the property, but the statement is rejected outright. If, indeed, Ifergan believed that there is no dispute regarding his rights in the property, he would not have called for submitting the claim. Even more so, he would not have submitted a request for granting a temporary injunction together with it. All these prove the fact that Ifergan was well aware of the dispute prevailing between him and Barens regarding his rights. In any event, if, indeed the plot

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

had been acquired in trust for him, the presumption is that he would not have been prevented from claiming this and would not have presented a deficient version to the Court that does not reflect the facts as they existed.

16. If this is insufficient, surely the claim regarding trusteeship also contradicts all the documents in the case. In this regard, we reiterate that the Companies Law establishes that "a Shareholder who is a trustee must report this to the Company, the Company must register him in the Shareholders' Register, specifying his trusteeship, and, regarding this law, he shall be regarded as a Shareholder" (Section 131(a) of the Companies Law). There is no dispute that Ifergan did not inform the Register of Companies of the share acquisition in trust and did not cause this to be registered in the Register as required. Even if this is insufficient to derogate from the right to benefit to demand from the trustee, when the time arrives, to transfer the shares to him (Compare: Shlomo Kerem **Trusteeship** 309- 310 (5774 – 2014)), surely, at the least, reference is to the fact that could lead to additional eroding of Ifergan's claim. Whatever, a person claiming trusteeship must prove this. We reiterate that, pursuant to Section 2 of the Trust Law, 5739 – 1979 (hereinafter: "the Trust Law") "A trust is created, pursuant to the law, according to a contract with a trustee or pursuant to Dedication Letter." There is no dispute that the trusteeship claimed was not created pursuant to law or pursuant to a dedication letter. A trust contract was not presented and, despite the fact that there is no requirement for a written trust contract, surely, a person claiming a trust must prove that this sort of contract was drawn up. This claim did not arise expressly in Ifergan's statements and, in fact, the absolute opposite can be understood from his evidence. Ifergan was asked time and again in what the trusteeship gains expression and he explained that "a trustee is person in whom I trust, this is a person that I believe in" (page 23 of the transcript, rows 6-9 and rows 14-15). He explained that the trusteeship was created by virtue of the relationship of friendship between the two "gradually, we became like brothers" (Ibid rows 29-30). He confirmed that no trust contract had been signed and no document whatsoever had been prepared that mentions the word trust (page 24 of the transcript, rows 1-6). All the aforementioned indicate that the two had never reached an agreement pursuant to which Barens would serve as a trustee for Ifergan and, regretfully, Ifergan was not able to meet the obligation of proving this claim. Barens indeed provided a Power Attorney in Ifergan's favor, but it was not stated in this Power Attorney that Barens would serve as a trustee for Ifergan. This latest claim regarding the trusteeship is only intended as an attempt at a shelter for Ifergan against the results of his deeds: that the artificial and restrained claim of this type cannot be accepted when it is an absolute contrast to the documents and evidence of Ifergan himself.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

**The Payment for Acquiring the Company**

17. As aforementioned, according to Ifergan, he acquired the Company and its shares. According to him, he bore all the payments for the acquisition (Section 16 of the original affidavit and Section 14 of the amended affidavit). Ifergan did not present any evidence whatsoever that supports this claim in the frame of reference of his original affidavit. A document presuming to be a document prepared by a bank, which, according to him proves that he transferred money to Dadash for acquiring the Company was attached to the amended affidavit (Appendix E of the amended affidavit). Regarding the matter of this document, in his affidavit, he claimed that reference is to "some of the financial transfer documents" (Section 33 of the affidavit) and that he is assiduously trying to trace additional documents. Despite this last statement, Ifergan did not submit additional documents. The documents that were submitted lack any evidential value, because who the owner of the account is cannot be established from it (The document does not have a heading and the name of the account specified in it is "Ifergan Gur"), it was not submitted by way of suitable evidence and does not in any manner enable knowing who executed the financial transfers described therein. Alongside most of the rows in the document some or other name has been specified in handwriting. According to the Petitioner, this proves who transferred the sum in the same row. It is impossible to know by whom, when and on what basis these records were recorded. The Petitioner argues in his evidence that a teller at the bank recorded the names alongside the rows in the document (Page 28 of the transcript, rows 5-6 and rows 27-29). It is superfluous to state that the teller was not subpoenaed for evidence and this claim was not proven in any manner whatsoever.

If this is not sufficient, indeed, all the payments detailed in the document that the Petitioner attributes to the transaction between him and Dadash were executed many months prior to signing the agreement with Dadash. The Petitioner indicates payments that were made on August 16, 2007, September 28, 2007, October 22, 2007 and January 4, 2008, the total sum of which is $1,150,000, as payments that he paid as a part of the agreement. As aforementioned, the agreement with Dadash was signed on April 8, 2008. In the agreement itself, nothing was said regarding the sums that preceded and were paid prior to the time. This raises some amazement. This is intensified in view of the fact that the sum that Ifergan paid prior to signing the contract, according to him, is two thirds of the value of the sum established in the agreement itself. The only explanation that Ifergan gave to this amazing fact, when, in this instance also the first explanation arose, but, in his cross-examination, he Dadash is my friend "and he needed money" and I gave him money prior to signing the final agreement" (page 28 of the transcript, rows 14-17 and rows 21-22). In this matter as well, Ifergan's oral arguments face an explicit written document. The only support to his claims is that "banker document" that cannot serve as evidence and does not prove in any manner whatsoever any support for Ifergan's claims.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

December 24, 2014

**Originating Summons Ifergan vs. Barens**

In his conclusions, Ifergan's Attorney attempted to argue that from the fact that the documents to the Registrar of Companies were signed on the date of preparing the agreement, we can understand that the payment was transferred **in full** prior to signing the agreement. Not only is this argument not anchored in the agreement itself, and it is doubtful whether it is in line with the transfer of the owners loan, but it is in contradiction to Ifergan's evidence. In his examination, Ifergan replied that he had transferred some of the sum prior to signing the agreement **and some thereafter** (page 28 of the transcript, rows 14-17). Ifergan's rescinding his intention to have Dadash as a witness acts to his detriment in this matter as well.

18. It would not be superfluous to state that, in his conclusions, in the wake of his replies in the cross-examination, Ifergan emphasized that he had executed the transaction using Barens' name, because he had come up against a difficult economic situation. The economic plight in which Ifergan found himself in France forced him to leave France, against the background of demands from the tax authorities, his multitude of debts and the demands of creditors (or "persecutors" according to Ifergan's version in paragraph 6.2 of the conclusions of the reply; Ifergan claimed in his cross-examination that no financial debt remain to others and the debts had sprouted only after he had transferred ownership in the business, without any consideration, to the person who had managed it previously on his behalf – Pages 20-21 of the transcript; It should be noted that his Attorney prevented him from replying to some of the questions touching on these matters – see Page 20 of the transcript, rows 15-16). It would appear that, at this stage, he has forgotten his first version, that was introduced in Section 10 of the affidavit supporting the original Originating Summons, pursuant to which he registered the land in Barens' name because he "is innocent and lacks understanding in these matters." In any event, after it became clear from the cross-examination that Ifergan had managed businesses for many years, and the business had run into significant difficulties, he changed his opinion. His claims regarding that economic plight arouse difficulty in accepting his version, according to which he paid Dadash the sums established in the agreement. No explanation whatsoever was given as to how this person who was facing a real economic plight, to the extent that he did not have the ability to conduct transactions in his name and was forced to hide behind the identity of another person, has a sum of NIS 7 million for acquiring the Company. It must be elucidated that avoiding registering the assets in his name hints ostensibly at an attempt to conceal assets from creditors and, if indeed creditors assemble at the Petitioner's doorstep, one can only wonder as to why he had not transferred those immense sums, which he claimed he had, to them.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

19. If all the aforementioned are insufficient, surely for ambiguous reasons, Ifergan did not furnish documents that evidence payment of the balance of the consideration. Because, according to him the total consideration was NIS 7 million, that were paid out of his pocket (page 28 of the transcript, row 1), it is extremely difficult to assume that he does not have references regarding executing payments of these types of sums.

All the aforementioned lead to the conclusion that Ifergan has not been able to prove that the payments for the acquisition of the shares was made from his money.

**Interim Conclusion**

20. The aforementioned indicates clearly that Ifergan has not been able to prove that the transaction was made in his name and for him. All the documents prove the complete opposite; they were prepared by Ifergan and signed by him, when they include affidavits that are in absolute contrast to his current claims; it was not proven that Ifergan bore the payments for the acquisition of the shares (and, in fact even if it had been proven thus, this will not contain any proof as to the ownership of the shares being his); and no explanation was provided as to why the shares were acquired in Barens' name and not in Ifergan's name. The conclusion is, therefore, that Ifergan has not been able to prove that he is the Shareholder in the Company.

21. The Petitioner, who is well aware of the substantial evidential difficulties that he is facing, requests placing faith on Barens' statements that indicate, according to him that Barens admitted to his ownership of the shares or the plot. In this regard, he relied on evidence of Mark Marciano, who was introduced for evidence on his behalf, and on statements heard from Barens during his cross-examination, these will be discussed below.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

**Marciano and Barens' Evidence**

22. As aforementioned, the Petitioner believes that he can build on the evidence of Mark Marciano, a friend of both Ifergan and Barens. It must be clarified that, already at the beginning of his cross-examination, Marciano clarified that he was not involved in any business between the two and he did not know details from personal knowledge of their business in general or the transaction in particular (page 10 of the transcript, rows 19-20, page 13 of the transcript, rows 24-25). He added and confirmed that, in his opinion, Barens is an honest person (page 8 of the transcript, row 22).

23. In his affidavit, Marciano claimed that, in a meeting between him and Barens at Rabbi Pinto's Yahrzeit in Morocco (Section 3 of the affidavit), in September 2013 (page 14 of the protocol, rows 1-2) Barens told him that he had no intention of returning the plot in Rehovot to Ifergan until he receives the sum that Ifergan owes him from Ifergan (Section 3 of the affidavit). In Section 3 of affidavit, it is stated "Mr. Barens told me that he has no intention of returning the plot in Rehovot to Mr. Ifergan, a plot that belongs to Ifergan and that Ifergan registered in Barens' name until he receives what he has demanded from Ifergan."

It is impossible to know from this affidavit whether the statement regarding "a plot that belongs to Ifergan and which Ifergan registered in Barens' name" constitutes a part of the quotation of the statements that Barens made to Marciano, or just interpretations of Marciano regarding statements made to him by Barens. This matter was required of the witness in his testimony. During his testimony, on a number of occasions, Marciano described that conversation that was conducted between him and Barens, when each time he specifies that according to Barens, if Ifergan pays him the sum that he is claiming from him, "he will stop the proceedings and return the plot to him" (Page 8 of the transcript, rows 14-15; also see ibid, rows 18-21). The witness did not repeat the statement from which it was understood that Barens admitted to him that the plot is under Ifergan's ownership, but explained that when he used the word "return" the intention is that the property belongs to Ifergan. Thus the conclusion that the statement, pursuant to which reference is to "a plot that belongs to Ifergan" is the witness' interpretation of Barens' statements and not Barens' statement himself.

24. Marciano's evidence contains nothing to add any real substance to the Petitioner's claims. As aforementioned, Marciano was not involved in the businesses between Ifergan and Barens, and explicitly specified that he does not know why the shares were registered in Barens' name and what the essence of the businesses between the two was (page 10 of the transcript, rows 18-20). His evidence indicates the fact that, despite hearing these statements from Barens in September 2013, he only told Ifergan about them for the first time in March 2014.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

His excuse for the fact that he did not raise this matter previously to Ifergan is because "Ifergan is a fragile person who does not speak much" (page 14 of the transcript, rows 18-20). The statements that, according to him, Barens told him were first put into writing only as a part of the affidavit that was signed on August 20, 2014. Because, by nature of things, Marciano had not recorded that incidental conversation with Barens in September 2013 (page 15 of the transcript, rows 13-16), it is highly difficult to assume that he remembers the exact words used by Barens.

It would be superfluous to state that Barens denies any conversation of this type with Marciano (Section 3 of a supplementary affidavit dated September 29, 2014).

25. The most that can be said is that Marciano's part of its evidence indicates that, in the discussion with Barens, he told him that if Ifergan pays him a particular sum that Ifergan owed him, according to him (€1,200,000) he would return the plot to him. As aforementioned it is highly difficult to establish a factual determination on this evidence. However, ostensibly, things arose in a similar spirit in Barens' testimony during his cross-examination.

26. During his evidence, Barens confirmed the statement attributed to him according to which he said that he only wanted the money that Ifergan owed him and did not care about the plot (page 40 of the transcript, rows 22-23). Afterwards he stated that if Ifergan pays him €2 million he would return the plot and shares to him (page 42 of the transcript, rows 6-16)[1] However, Barens clarified that as long as the sum was not paid to him "the plot belongs to me and it is in my name" (Ibid rows 8-9 and rows 15-16). He also claimed that he transferred the money to Ifergan for acquiring the plot (Ibid rows 29-30). A question in this regard was first raised during the cross-examination and, in any event, Barens does not furnish any support for his claim. Immediately thereafter, Barens replied that Ifergan had acquired the shares and plot for him in consideration for all the favors and benefits that Barens had given him over the years. (Page 43 of the transcript, rows 7-9 and rows 16-17). Simultaneously with the claim that Ifergan had acquired the property for him because of all that Barens had done in his favor, Barens claimed that Ifergan had told him that he had acquired the plot "with the money that I had given him" (Ibid, rows 8-9).

---

[1] In the transcript, it was written that Barens used the word "return." The possibility that reference is to an error in translation cannot be negated. These statements were said in reply to questions by the Plaintiff's Attorney, who used this term time and again, and were translated through a translator into French and the least that can be said is that on many occasions he was not accurate in his translation. Despite this, and because the statements were translated such in the Originating Summons by the translator, I've assumed that Barens did indeed use this term.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**

27. Barens' testimony indicates that, according to him, the plot was given to him by Ifergan, under circumstances that it is doubtful whether he fully understood them, and that he is prepared to return the plot to Ifergan in consideration for money that reflects, according to him the debt that Ifergan owes him. These statements contain nothing as admission that reference is to shares or a plot under Ifergan's ownership, for, indeed from the outset, Barens has claimed that Ifergan acquired the shares for him (for Barens) and that they were transferred to him. In this regard, there is no reference to the importance of the question as to whether, according to Barens, the plot was given to him as a gift (a statement that prima facie indicates the fact that Ifergan acquired the plot from his own financial resources) or whether acquired using money that Barens had transferred to Ifergan (who, as aforementioned, admitted that he had run into economic difficulties). Be the matter what it may, the statement according to which Barens agrees to return the plot to Ifergan for a payment that reflects Ifergan's full indebtedness to Barens, cannot be perceived as a statement recognizing Ifergan's rights. The only thing that can be deduced from this is that, according to Baren, Ifergan gave him the plot and he is prepared to return it when the financial matters between the two are settled.

**In Conclusion**

28. All the aforementioned indicates that Ifergan was unable to prove that the ownership of the shares in the Company had been given to him, or that he had acquired the Company for himself. The documents and affidavits that Ifergan gave to the authorities, which he requested to ignore completely, prove the opposite. Ifergan was unable to establish any sufficiently solid evidential foundation and, in the truth of the matter, he was unable to present any evidential foundation whatsoever that could lead to the conclusion pursuant to which the items recorded in the sales agreement and at the Registrar of Companies do not reflect reality as it exists.

29. On concluding things, I must elucidate that there is substantial reason to disqualify submitting a claim to Court in the bounds of which the Petitioner requests that the Court accepts his version pursuant to declaring false declarations to the authorities, because he was unable to register the assets in his name, apparently in an attempt to conceal the assets from his creditors, whether they are overseas or in Israel. All this when, according to him sums of millions of new Shekels were at his disposal that he wanted to invest clandestinely. A person who acts in this manner can only complain about himself if, ultimately the Court does not place any trust in his versions.

[emblem of the State of Israel]
**The District Court in Jerusalem**
**before the Hon. Judge Ram Winograd**

**December 24, 2014**

**Originating Summons Ifergan vs. Barens**


**Conclusion**

30. In view of the aforementioned, this claim has been rejected. The Petitioner must bear the Respondents' expenses in the sum of NIS 4,000 as well as the Respondents' legal fees in the total sum of NIS 36,000.

31. One can only express regret on the fact that friendship of so many years has become bitter rivalry of a financial dispute. One can only hope that after receipt of the judgment, the Parties will attempt to resume their previous relationship.

**The Secretariat must send a copy of this Judgment to the Parties and return the bond that was deposited in the framework of the temporary remedy to the depositor.**

**Handed down today, 2nd Tevet, 5775, December 24, 2014, in the absence of the Parties.**


[signature]

Ram Winograd, Judge